Thank you. The next matter on our calendar is Payne v. Cornell University. Morning, counsel. Good morning. May it please the court, Stephen Bergstein for the plaintiff appellant. We have two claims on appeal here from the grant of summary judgment. First, we argue that the jury may find that plaintiff was denied reasonable accommodations and related to a hostile work environment in the course of her employment with respect to the reasonable accommodations. Number two, plaintiff has a retaliation claim that was dismissed on summary judgment. We think a jury can find her favor on that issue as well. On the reasonable accommodation claim, I want to make clear that the flex agreements that Cornell instituted were fair on their face. We're not challenging the terms of the flex agreements. How many were there? How many flex agreements? There were two flex agreements and then a formal accommodation. The problem is not the terms of the flex agreements. It's the way that they were implemented. One supervisor in particular, by the name of Lindsay, seemed resentful over plaintiff's ability to work from home because she was recovering from cancer treatment. And plaintiff testified, and it's in her affidavit, that on various occasions, she was denied the opportunity to work from home and that Lindsay essentially was not complying with the plain terms of the flex agreements. This is one of the rare cases where you have a good accommodation in place, but it's not properly implemented. Counselor, would you agree that the terms of the flex agreement involved some sort of consultation and didn't presuppose a always granting just because it passed? It depended on the flex agreement. There were two. The first flex agreement appears to allow her to work from home remotely on a daily basis. And that was February 2017. And then in May, the second flex agreement was sort of as needed. I guess she was feeling better and she wasn't always expected to be working from home. But my question was, was it one-sided? Both of them had a requirement of advanced notice. And I see something like advanced notice, that presumes to me some sort of conversation where it's not just immediately granted upon raising it. Would you dispute that? She had to keep her supervisors informed of her schedule and to obtain pre-approval to work from home. That was the first flex agreement. The second flex agreement is not too different from the first, honestly. And of course, there's going to be back and forth. But doesn't the pre-approval imply that once in a while or at least sometimes it would be denied? Not if the plaintiff genuinely had a need to work from home because she wasn't feeling well or had medical appointments. The plaintiff's testimony was that when she needed it, it was denied. And then there was just resentments. And there was just an attitude, you're missing too much work. So that's the basis for her claim, that it was not complied with on a good faith basis. And this is in the course of her deposition testimony and her affidavit. On the retaliation claim, the district court said that there's no causal connection because you're only allowed a two-month window between the protected activity and the adverse action. But this court has said many times that you can go beyond two months, you can go as far as eight months. And in this case, we have a five-month gap. So it falls comfortably within the causation period. Plaintiff told defendant in August 2017 that she had contacted the EEOC over her disability discrimination concerns. And then the hiring process that took place that's relevant to her retaliation claim, that unfolded in December 2017, January 2018. So we're within a five-month gap. So the causal connection is shown here for the prima facie case. We know based on the plaintiff's sworn testimony- If I may, even assuming that we agree, which I'm not saying that we are, that there was a prima facie case made, can you respond to the idea or the argument that Cornell's hired a more qualified person for this open position? And Lindsay was not hired back, right? Is that correct? So not only was plaintiff, her supervisor was not, neither of them were hired. Correct. But plaintiff put in for it and was denied it. And plaintiff asserts that she was qualified for the job. She was already doing the work that the new position entailed. So she's qualified. And so defendant says, well, we hired somebody more qualified. The problem with that, it's very unique what happened in this case on the record. We don't know the name of the person who got the position. I don't think it's in the record. What the most that we know about the selectee is based on what other people are saying about the process that Catherine Doxey, the HR director, her affidavit says the associate dean chose the candidate based on qualifications. We don't know anything about the candidate There's almost no evidence in the record about the process resulting in this choice. So you have sort of a conclusory argument that we hired somebody more qualified when plaintiff herself testified that she was qualified having done the work. So when you have the prima facie case and a conclusory argument by defendant about pretext, then the jury can find that the plaintiff was denied the position because in retaliation for complaining to the EEOC, I'm not saying she will win a trial, but she can win a trial. We have enough evidence to support such a claim. I want to go back for a second to the accommodation. Didn't Ms. Payne on her way out thank the people at Cornell for being sensitive to her needs and helping her in her time of troubles? She didn't thank everybody. Some people were helpful to her. That's one of the arguments defendant is making that at some point plaintiff testified that things are working fine. She said that after Lindsay was no longer her supervisor. Some people helped her. Lindsay didn't help her. Her supervisors to whom she complained about the reasonable accommodation didn't help her. Plaintiff brought up these concerns to two supervisors, Weaver and Allen, and they essentially... I have another question about what she was subjected to. Do you think it's unreasonable if you're working at home to put the hours that you worked on the supervisor's calendar so that the supervisor knows when you're actually working? That's... I hear what you're saying. Plaintiff said she was doing what she was supposed to do to keep her supervisor apprised of her hours. She wasn't because she didn't always enter it on Lindsay's calendar, which was something that Lindsay requested. I think plaintiff said Lindsay was not holding up her end of the deal in terms of coordinating this process where plaintiff would let Lindsay know when she's working and when she can't work and that plaintiff was doing what she could and Lindsay was not cooperative in that regard. But that is not necessarily an issue with respect to whether there's good faith implementation of the reasonable accommodation. That's where the plaintiff is just a good worker and there's really not a claim here. She wasn't fired for job performance, so if plaintiff was not doing everything she was supposed to with respect to the reasonable accommodation, it doesn't eliminate her complaint overall that Lindsay was not complying with the flex agreements and good faith. All right, your time has expired. You've reserved three minutes for rebuttal. Thank you. Good morning, Your Honor. Adam Pence for Cornell. May I please report? I'd like to start by saying a little surprised by my colleague's argument. He appears to be abandoning the official discrimination requirement. He did not address that. To the extent that the court has questions, I'd be happy to address it, but we will just refer to our papers first so that I can properly address the argument. I'm sorry, I'm having a little trouble hearing you. I am too. I'm not sure how much can be done. Stop the clock for a minute. I can speak up. Is that better? That's much better. My apologies. I'm not used to the earphones. Okay, start the clock again. To be honest, Your Honor, we're a little surprised because it appears that Ms. Payne is abandoning her discrimination claim on the directly or at least not focusing on it. To the extent that the court has questions, I would be happy to address it, but we'll just refer to our papers for that particular thing to focus more on what has been written today. I think at its core, one of the things that has been ignored so far in this discussion is the fact that Cornell proffered mountains of evidence establishing that it fulfilled all its obligations and did its best to accommodate Ms. Payne. In opposition to summary judgment, Ms. Payne only disputed or partially disputed 36 of the 162 proffered statements of material fact. And I would draw the court's particular attention to statements 62 and 77 and 78, which are on pages 998 of the joint appendix and 1008 to 1009 of the joint appendix because these directly involve assertions about the plexiglass saying that a requirement to exercise the accommodation was to provide reasonable notice and to provide a record of the adjustment on Tammy Lindsay's calendar so that she could better track Ms. Payne's whereabouts and what she was working. Can I ask how much advance notice that a plaintiff could have provided if she woke up unexpectedly sick or became sick unexpectedly? Well, there's two issues. One is that there can be reasonable notice for medical appointments for Ms. Payne. And to the extent that there would be an emergency situation, I think that could be accommodated on a shorter period of time, which is why I always require them to be a flexible work agreement is a reasonable accommodation. No one has to wonder if you're too sick to come to work. That may mean that the person will be working from home. That was one of the disputes that was had when notice was provided, right? The accommodation was to allow for time to be at home to get to medical appointments and recover, but it wasn't meant to be an everyday thing in terms of a flexible agreement, which was supposed to be an everyday thing while she was under treatment for her cancer. She was having treatments that made her sick. Well, the first flexibility came after she was allowed to come back to work. So there's a period of time prior to the flexibility where she was out on completely, but the time period under the first flexibility, she was able to come into work and it was not that she would be working from home every day. She would be working from home on the days that the appointments or other medical needs weren't. And the testimony we have on this is undisputed. She was under the understanding that she had requirements to be met before exercising the accommodation. And while there was no limit on the amount of time she could theoretically work from home, there's nothing in the record to establish that it was going to be every day working from home relationship. Remember this was 2017, a long time before the world we currently live in. And so the terms of the flexible agreement, I think speak for themselves. They allow for the possibility, but not the expectation. Counsel, tell us about the people who were hired instead of Denise Payne for the new jobs that became open. The record is silent. So I realize this is extra record, but all you say is that they had better qualifications. How do we know that? Well, respectfully, I take issue with the characterization that the record is silent. Cornell has met its burden of what's required to establish the legitimate non-discriminatory What do you view that burden as? I view the burden as providing an explanation, certain testimony that's admissible in court that would support that reason. And Cornell has provided that in the form of two declarations of testimony from HR representative who reviewed the files. And for the first position, the research and information analyst position, what is in the record is that this was a higher level position than what Ms. Payne had been coming from. It involved data analysis that was something that had not done before. And they found a candidate who had an advanced degree and previously worked for IBM that they thought was a better fit for that position. In terms of the second position, the project manager position, it also involved high level data analysis and interacting with various members of Cornell community to convey that information. They hired somebody who also had a degree, an advanced degree, considered more relevant in public administration and had done relevant work at another university. The concern with Ms. Payne in that regard was that she had had trouble performing such high level data analysis before and had trouble communicating that information to others. And that's been in the record dating back to before her cancer diagnosis when these issues were raised with the job she had prior to the business analysis. There's also in the record an email from the person who made the hiring determination or information search, Beth Fox, where she wrote to Ms. Payne contemporaneously explaining these very things. I'm sorry, can we, can I just understand or if you could help me understand, like at this point, shouldn't we be interpreting the dispute and the evidence in favor of Payne and she has introduced evidence that she was qualified for this? Yeah, there's two things to remember. First of all, she hasn't met her on the patient book. She's presented no evidence of direct discrimination or animus. She's presented no evidence of disparate impact. She is entirely relying on what she claims is temporal proximity between the variety of protected activities she's engaged in and these subsequent actions by Cornell. And she's focusing, at least according to her paper, on the subsequent re-hiring decision, which were a very long time, five to six months after her last protective activity. And so courts in this jurisdiction, while they don't have a bright line rule, do not allow for that type of causal connection for a period of time longer than a few months, if there isn't some other circumstance or other causal evidence to warrant the extension of that time period, such as in the case where the first opportunity to retaliate against someone engaged in that could be long after that period of time. That is not the case here. There are numerous instances where they could have theoretically retaliated against her, but by her own testimony they did not. Now, she can't meet her burden on the primifacious side. Even if she could, though, we've presented evidence that they hired better qualified candidates. She can cite to nothing in the record other than her subjective belief that for these positions she was better qualified than these individuals, that even though they had more relevant experience and higher levels of and the case law does not support finding that she has met the burden of establishing pretext. They've done nothing more than a disagreement with those hiring and no other evidence to support her. Now, I'm almost out of time, so I want to make sure I address the hospital work environment. I think that was not a focus of too much of the earlier discussion, but I think the case law is on this. What would have been alleged in the complaint, even if every single thing were true, which it is not, would not be enough collectively or individually to rise the level of something so severe. She claims she was supervised differently than other people. She claims there was much more micromanaging of her work than the people who did her job, other people. Even if that were true, that's not enough to establish a hospital work environment. And the district court had good reasoning here explaining the fact that what really this amounts to is a few isolated disputes as to the working relationship between the supervisor and the employee. And the requirements for her to use her accommodations were, as the district court said, quite reasonable. And then the interactions and disagreements that came from that were basically traditional workplace dynamics between the supervisor and the employee, who has been out of work a lot and is trying to get caught up and get trained so that she can perform her job. Thank you, counsel. We'll hear from Mr. Bergstein. Okay, a couple of points. We are not a fan. I have a question. Okay. One of the things that Cornell says is that because Ms. Payne was not around to get training, she wasn't qualified for these jobs. She herself missed the training because she was either working from home or not available to be trained. Can you speak to that? Sure. She was out because of her disability, because of her cancer, but she also said she had been doing the work for the position that Cornell identified as having opened up. But she doesn't deny that she missed opportunities for training, does she? I don't think she denies that, but wouldn't that go into the mix for the jury? If she was already doing the work, how much training does she need? And we're not abandoning the disparate treatment and hostile work environment claims. The way we structured the brief, it just seemed as though the failure to implement the flex agreements in good faith was disparate treatment as well, and there was a hostile environment because there were comments made to the point of expressing unhappiness that she had this flex agreement. And there was a fairly negative attitude that plaintiff was allowed to take time off when she needed it. The question about whether it's a hostile environment is whether the environment was for the worse, that she was treated this way for the worse because of her disability. That's settled law in the Second Circuit. And over the course of her flex agreement period, when she's putting up with this and she's complaining about the way she's being treated and management is not responding in any affirmative way, and they're essentially blaming her for the problem, that's enough for a jury. And a jury should determine whether it's a hostile work environment to the extent this court thinks that might be a close call. Close calls are for the jury under Gallagher versus Delaney from 25 years ago. My adversary mentioned the five or six months are too long for retaliation claim. No, it isn't. Not under Second Circuit cases. And even if it is, she was denied the promotion at the first available opportunity, which is another way to show... But she was her supervisor though, right? In both of those instances, someone that... Do you dispute that the supervisor would also have been qualified? Suppose she would have been, but she's not the plaintiff here. And I don't remember if plaintiff certainly did and plaintiff was denied the position after she engaged protected activity and she was denied the position despite being qualified within a reasonable time after she complained. I'm just wondering if that speaks to rebutting an argument of pretext. If the fact that her supervisor... And she did put in for at least one of the jobs, if I remember the facts correctly. I think she did. I think she did. And she also didn't get the position and they found someone that was more qualified than both the person and her supervisor. How much room does that leave you to prove pretext? I think she can still show pretext if the plaintiff herself was qualified. And then the issue for the jury is, well, was there a retaliatory intent? We know very little about the selectee. That's the problem. We're relying on hearsay about who they chose and that person's qualifications were. We're getting into issues that normally are hashed out at trial. I mentioned first available opportunity for retaliation claim, even if five or six months is too long, which it isn't. This court has said in cases like SUMA and others that if management is not in a position to retaliate and then they subject the plaintiff to an adverse action, that's evidence. That's a causal connection. And the first available opportunity was when this position opened up. Finally, my adversary mentions that most of what plaintiff is relying on as evidence of discrimination and retaliation is her testimony. That's admissible evidence. We all know the plaintiff's sworn testimony is enough to repel a summary judgment motion. And she gave affidavit testimony. She gave deposition testimony. All of us in our brief, to these reasons, this court should reverse and remand this case for trial. Thank you. Thank you, counsel. Thank you both. We'll reserve decision. The last case on our calendar is on submission. So I will ask the clerk to adjourn court. Court stands adjourned. Thank you, judges. I'll transfer you. Thank you. You're welcome. Thank you.